

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00358-CR

Cristian **YEPEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2014CRN001641-D4
Honorable Oscar J. Hale, Jr., Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:       Sandee Bryan Marion, Chief Justice
               Patricia O. Alvarez, Justice
               Beth Watkins, Justice

Delivered and Filed: July 3, 2019

AFFIRMED

A jury found appellant Cristian Yepez guilty of murder and tampering with evidence and assessed punishment at thirty years' and fifteen years' confinement, respectively.  On appeal, Yepez argues: (1) the trial court erred in admitting expert testimony; (2) the trial court abused its discretion in denying Yepez's motion to suppress; (3) the trial court erred in denying Yepez's request to include a concurrent cause instruction in the jury charge; and (4) the evidence is insufficient to corroborate accomplice witness testimony.  We affirm.

**BACKGROUND**

An unidentified caller contacted 9-1-1 and reported a domestic disturbance between a male and a female at an apartment complex in Houston, Texas. Fifteen minutes later, another 9-1-1 operator received an anonymous call regarding the same domestic disturbance. The second caller stated a woman, later identified as Janette Pantoja, came outside of the apartment and told the caller she had been kidnapped and the kidnapper had killed her three-year-old daughter Jasleen. Officer Daniel Lunceford of the Houston Police Department responded to the disturbance and spoke to Pantoja. Officer Lunceford described Pantoja as crying hysterically. Pantoja stated her boyfriend, Yepez, had hit her with a closed fist, and Officer Lunceford observed bruising above her eyebrow. Pantoja also told the officer she was from Chicago and Yepez was keeping her against her will after killing her daughter, Jasleen, when they were in Laredo. Officer Lunceford took Pantoja to the police station, where Detective Robert A. Klementich questioned her.

Detective Klementich was already familiar with Pantoja. Over the past couple of weeks, he had been working on a missing child case with the Chicago Police Department, which reported the missing child's mother and the mother's boyfriend – Pantoja and Yepez – were staying with Yepez's relatives in Houston. Pantoja's relatives had contacted the Chicago Police Department about the missing child after Pantoja and Yepez returned to Chicago from Laredo without the child. According to Pantoja's relatives, Pantoja and Yepez told her family the child had been kidnapped. The Chicago police gave Detective Klementich two Houston addresses, and Detective Klementich sent officers to both locations. At the second location, one of the investigating officers encountered a group of individuals, which included a woman who gave the officers a false name and acted "squirrely." Later, Detective Klementich and the investigating officers received photographs of Pantoja and Yepez from the Chicago police and realized the woman they encountered was Pantoja. However, when the investigating officers returned to the location,

Pantoja was no longer there. When Detective Klementich subsequently met Pantoja at the police station, he knew Pantoja was from Chicago and connected to the missing child case. He questioned Pantoja concerning Jasleen's whereabouts, and she stated Yepez had assaulted her at the Houston apartment and killed Jasleen when they were in Laredo.

Detective Klementich dispatched two officers to bring Yepez to the station for questioning. He believed he had probable cause to arrest Yepez for assault family violence. He also believed he had enough information to detain Yepez to investigate Jasleen's whereabouts. After the dispatched detectives arrested Yepez for assault family violence and unlawful restraint, they brought him to the police station. Detective Klementich informed Yepez of his *Miranda* rights. Although Yepez initially waived his *Miranda* rights, during the interview he indicated he wanted to speak to a lawyer. Detective Klementich ended the interview and informed Yepez he was going to be charged with unlawful restraint. Detective Klementich then left, leaving Yepez handcuffed in the interview room.

Approximately an hour later, Yepez asked to speak to the detectives and told them Jasleen had been kidnapped. Yepez then changed his story and told the detectives that on the day Jasleen died, she had been swimming at the motel pool when they were in Laredo. After swimming, she started throwing up and was highly irritable and crying. Yepez stated that when he, Pantoja, and Jasleen returned to the motel room, he put Jasleen in "timeout" and placed her face to the wall to calm her down. She continued to cry and throw up until she collapsed and lost consciousness. Yepez said he contacted a man who helped him bury the body.

Detective Klementich contacted the Laredo Police Department and shared Yepez's statements about burying Jasleen's body. Laredo Police Detective Greg Cantu drove to a specified location – an empty lot near a gas station – where he found a child's skeletal remains. Detective Cantu secured the scene, contacted his supervisor, and waited for a crime scene investigator to

arrive. Chief Medical Examiner Dr. Corinne Stern arrived at the scene and determined the empty lot had recently been cleared, exposing the remains. Dr. Stern collected the remains and sent them to Dr. Oscar Harrell Gill-King, a forensic anthropologist who analyzed the remains to determine the cause of death. Dr. Gill-King identified the remains as Jasleen. In his report, Dr. Gill-King indicated the skull displayed signs of "perimortem vertical loading," and concluded the child's death was caused by her skull striking a static object.

A grand jury indicted Yepez for felony murder, serious bodily injury to a child, and tampering with evidence in connection with Jasleen's death. At trial, the State argued Yepez murdered Jasleen by striking her head with blunt force. The defense argued she died due to dry drowning, after which Yepez and Pantoja panicked and buried the body. The jury heard testimony from several witnesses including Pantoja, the detectives and officers working on the case, and Dr. Gill-King. Pantoja testified Yepez grabbed Jasleen by her ankles, held her upside down, struck her head against the bathroom floor and later against the bathroom sink. Pantoja testified Jasleen reacted by "just sitting" on the countertop. Pantoja testified Yepez then took Jasleen to another room and slammed the bathroom door, leaving Pantoja in the bathroom. Thereafter, she heard another bang and Jasleen was unconscious when she opened the door. She testified she unsuccessfully attempted CPR, but Jasleen never regained consciousness. Ultimately, Pantoja explained Yepez decided to bury the body.

In addition, Dr. Gill-King testified he determined the child's cause of death was homicide caused by vertical loading. The forensic anthropologist also testified the injuries to Jasleen's skull were consistent with someone holding her by the ankles with her head hanging down and then hitting her head against a hard surface. On cross examination, Dr. Gill-King further opined that earth moving equipment used to clear the lot where Detective Cantu found the remains did not

cause the injuries to Jasleen's body. The jury also saw photographs of Jasleen's remains and watched a videotape recording of Yepez's statements made to Houston police.

At the charge conference, Yepez requested a jury instruction on concurrent cause, arguing the evidence showed the child died from dry drowning. The trial court denied the request. The jury found Yepez guilty of felony murder and tampering with evidence. Yepez appealed.

**ANALYSIS**

***Expert Testimony***

In his first issue, Yepez argues the trial court abused its discretion by admitting Dr. Gill-King's expert testimony regarding the child's cause of death. Yepez claims Dr. Gill-King's testimony was unreliable because the scientific theory and technique he used were not valid and there was a large analytical gap between the evidence and his proffered opinion.

*Standard of Review*

We review a trial court's decision on the admission of expert testimony for an abuse of discretion. *Rhomer v. State*, No. PD-0448-17, 2019 WL 408186, at *3 (Tex. Crim. App. Jan. 30, 2019). "[A] trial court abuses its discretion when it acts without reference to any guiding rules or principles or acts arbitrarily or unreasonably." *Id.* We will uphold the trial court's ruling on the admission of evidence unless it lies outside the zone of reasonable disagreement. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

*Applicable Law*

A witness who qualifies as an expert by knowledge, skill, experience, training, or education may testify if scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact issue. TEX. R. EVID. 702. The proponent of the testimony must establish by clear and convincing proof that the proffered testimony is sufficiently relevant and reliable to assist the factfinder in reaching an accurate result. *Vela v. State*, 209

- 5 -

S.W.3d 128, 134 (Tex. Crim. App. 2006). To assess the reliability of an expert's opinion based on a hard science, the Court of Criminal Appeals has set forth the three-prong *Kelly* test, requiring that "(1) the underlying scientific theory be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question." *Rhomer*, 2019 WL 408186, at *4 (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)). In addition, courts should consider:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualifications of the experts testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly*, 824 S.W.2d at 573.

When expert testimony concerns a field of study outside the hard sciences, the Court of Criminal Appeals instructs us to apply the *Nenno* test to evaluate the reliability of an expert's testimony. *Rhomer*, 2019 WL 408186, at *5 (citing *Nenno v. State*, 970 S.W.2d 549, 550 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999)); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). "The *Nenno* test asks whether (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon

and/or utilizes the principles involved in the field." *Rhomer*, 2019 WL 408186, at \*5; *Weatherred*, 15 S.W.3d at 542. In applying this framework, we must refrain from developing rigid distinctions between "hard" and "soft" sciences, because the distinction between various types of testimony can be blurred. *Morris v. State*, 361 S.W.3d 649, 654 (Tex. Crim. App. 2011). Under either the *Kelly* or *Nenno* test, reliability should be evaluated by referencing the standards applicable to the particular professional field in question. *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010).

*Application*

Dr. Gill-King identified himself as a forensic anthropologist who analyzes skeletal remains to identify people and determine their cause of death. He testified forensic anthropologists are generally contacted by authorities to examine remains. When the remains are brought to him, he inventories the material, cleans it, and analyzes it. He explained that forensic anthropologists use various cleaning methods depending on the situation. He added that sometimes authorities provide background information regarding the scene where the remains are found, and he prefers to have limited information regarding the facts of the case to avoid bias. After analyzing the material, he creates a biological profile and writes a report with his interpretations. He explained that forensic anthropologists make objective and subjective observations, and their reports are not subject to a formal peer review process. He further added that no standards of practice have been established to guide forensic anthropologists on how to make interpretations, but official standards of practice are being developed.

Turning to the instant case, Dr. Gill-King testified he received a "nearly complete skeletonized remains of a human infant" to examine along with information that the Laredo police discovered the remains in a shallow grave. He explained the remains were in an advanced state of

decomposition because they were recovered in a shallow grave and were exposed to a high level of bacteria, which accelerated the decomposition process.

Dr. Gill-King also testified the remains displayed no sign of antemortem trauma, eliminating any indication that the child had old injuries or was abused over an extended period. He opined the remains displayed perimortem trauma – trauma that occurred at the time of death. Such trauma was significant to Dr. Gill-King because it could explain the cause of death. In this case, he observed "the skull was broken in several pieces." He also noted it exhibited a diastatic fracture – breakage at a suture – at the top of the head and fractures on both sides. According to Dr. Gill-King, these characteristics – multiple fractures, diastasis, and fractures on the sides of the skull – constituted three of the five key criteria forensic anthropologists use to indicate signs of "cranial death" – death caused by a head injury or injuries.

Dr. Gill-King further testified the fractures in Jasleen's skull were consistent with fractures caused by vertical loading, an injury that occurs when the skull strikes a static object, transferring energy from the top of the skull, down through its base, and along the spinal axis. For support, he pointed to the diastatic fracture, an area where a small piece of bone was pressed in when Jasleen's skull struck a static object. He explained diastasis is a classic sign of head trauma in infant deaths. He further explained the fractures at the base of Jasleen's skull and radiating out from her spine indicated that her head had been struck against a static object. When her skull was struck against the static object, the shock travelled through her body and transmitted force through the base of the skull, resulting in the fractures. He ultimately concluded the injuries were static as opposed to dynamic, highlighting that the terms "static" and "dynamic" were widely used in his field.

Yepez contends Dr. Gill-King's testimony was unreliable because the scientific theory and technique he used were not valid. Specifically, Yepez argues Dr. Gill-King's report was not subject to peer review and another expert disagreed with the report's conclusions. However, the

Court of Criminal Appeals has stressed that "the absence of peer review does not necessarily undercut the reliability of the testimony." *Nenno*, 970 S.W.2d at 562. Rather, any doubt created by the absence of peer review goes to the weight of the evidence rather than its admissibility. *Id.* Similarly, disagreement between experts also goes to the weight of the evidence, and the jury can believe one expert over another. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

Yepez also argues Dr. Gill-King's testimony was unreliable because a large analytical gap existed between his opinion and the underlying facts. According to Yepez, Dr. Gill-King's opinion did not coincide with the State's theory that Yepez killed Jasleen by striking her head against a static object. We disagree. After Dr. Gill-King opined the child's fractures were perimortem and caused by static force, he specifically testified the injuries would be "consistent with" someone holding a child upside down and striking the child's head against a hard surface, like the floor. He testified that based on his experience with examining remains of injured children, he believed Jasleen died after her head was struck against a static object.

The record reflects Dr. Gill-King based his opinion on a methodology generally used by forensic anthropologists when analyzing skeletal remains and on his years of experience analyzing skeletal remains and injuries in children. *See Coble*, 330 S.W.3d at 274. And although Dr. Gill-King stated his report was not subject to peer review, the record is clear that he based his opinion on principles relevant in his field of study. *See Nenno*, 970 S.W.2d at 562; *Coble*, 330 S.W.3d at 274. Accordingly, we hold the trial court did not abuse its discretion in admitting Dr. Gill-King's expert testimony regarding Jasleen's cause of death. We therefore overrule Yepez's first argument.

### *Motion to Suppress*

Next, Yepez argues the trial court erred in denying his motion to suppress statements he made to the Houston police. According to Yepez, the statements constituted fruit of the poisonous

tree because they were the product of a warrantless arrest made without probable cause. He further contends the subsequent *Miranda* warnings the police gave him at the police station did not sufficiently attenuate the taint of the unlawful arrest.

*Standard of Review*

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). A trial court abuses its discretion if its decision is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *Id*. In reviewing the ruling, we apply a bifurcated standard. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016). We afford almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that turn on the weight or credibility of the evidence. *Id*. We review de novo the trial court's determination of pure questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Id.* If, as here, the trial court makes express findings of fact, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports those factual findings. *Valtierra v. State,* 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

*Applicable Law*

Probable cause requires an officer to have a reasonable belief that, based on the facts and circumstances within the officer's personal knowledge, or of which the officer has reasonably trustworthy information, an offense has been committed. *Torres v. State*, 182 S.W.3d 899, 901–02 (Tex. Crim. App. 2005). Probable cause must be based on specific, articulable facts rather than an officer's mere opinion. *Id.* To determine whether probable cause exists, we use a totality of the circumstances approach. *Id.*

When, as here, a defendant argues his warrantless arrest was illegal, the proper inquiry is whether the arrest fell within one of the statutory exceptions to the warrant requirement. *Stull v.*

*State*, 772 S.W.2d 449, 451 (Tex. Crim. App. 1989). Here, the parties dispute whether the Houston police were authorized to make a warrantless arrest under the family violence exception outlined in the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 14.03(a)(4). That exception authorizes an officer to arrest a person without a warrant if the officer has probable cause "to believe the person committed an offense involving family violence." *Id.* An offense involves family violence if there is evidence the actor committed acts intended to result in physical harm, bodily injury, or assault against a victim with whom the actor has or has had a dating relationship. TEX. FAM. CODE ANN. §§ 71.004, 71.0021(a). "The fruit of the poisonous tree doctrine generally precludes the use of evidence, both direct and indirect, obtained following an illegal arrest." *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010) (internal quotations omitted).

*Application*

The trial court found that Houston police officers had probable cause to believe Yepez committed an act of family violence against Pantoja. At the motion to suppress hearing, the trial court heard evidence that two anonymous people called 9-1-1 to report a domestic dispute. The first caller specifically told the 9-1-1 operator it sounded "like he is beating her." The other caller stated he saw Pantoja run outside, where she told the caller Yepez was hitting her. The court also heard testimony from Officer Lunceford, one of the officers dispatched to the scene, who testified that when he arrived, Pantoja was crying hysterically. Officer Lunceford also testified he observed bruising above Pantoja's eyebrow and that Pantoja told him Yepez hit her with a closed fist. This information was relayed to Detective Klementich, who spoke with Pantoja when she arrived at the police station. He testified he personally observed marks on Pantoja's face and that Pantoja told him Yepez had physically restrained her. Based on this information, he dispatched two officers to arrest Yepez for family violence.

The dispatched officers both testified they received information that there had been a physical altercation between Yepez and Pantoja, leaving Pantoja with injuries to her face. The dispatched officers further testified that when they arrived at the apartment to arrest Yepez, they spoke to a neighbor who showed them a cell phone video of the altercation. The video depicted the couple fighting inside the apartment. One of the officers testified, "[y]ou could see the blinds moving, her kicking and try to get away. You could see Mr. Yepez actually come out, peek out." When viewing this evidence under a totality of the circumstances approach, the officers had probable cause to believe Yepez had committed an act of family violence against Pantoja and arrest him for that offense. *See* TEX. CODE CRIM. PROC. art. 14.03(a)(4); *Torres*, 182 S.W.3d at 901–02.

Yepez argues the family violence exception outlined in article 14.03(a)(4) applies only where an officer needs to defuse a situation immediately. Nothing in article 14.03(a)(4) imposes this requirement. *See* TEX. CODE CRIM. PROC. art. 14.03(a)(4). Rather, article 14.03(a)(4) permits an officer to make a warrantless arrest if the officer has probable cause to believe: (1) the suspect has committed an assault; (2) the victim of the assault is a member of the suspect's family or household; and (3) the assault resulted in bodily injury to the victim. *See id*.; *see Randolph v. State*, 152 S.W.3d 764, 773 (Tex. App.—Dallas 2004, no pet.) (outlining three requirements of article 14.03(a)(4)). Here, the record reflects the officers had specific, articulable facts to reasonably believe Yepez had committed an assault, Pantoja and Yepez were involved in a relationship, and the assault resulted in a bodily injury to Pantoja. Accordingly, the State met its burden to justify this arrest pursuant to article 14.03(a)(4).

Yepez finally argues Detective Klementich could not make a probable cause determination because he could not rely on Pantoja's untrustworthy statements. The record, however, reflects Detective Klementich did not rely only on Pantoja's statements that Yepez hit her when making his probable cause determination. He also relied on the information relayed to him by Officer

Lunceford, his own observation of the marks on Pantoja's face, and the information from the Chicago police investigation that Pantoja was living with Yepez in Houston. Based on these facts and circumstances, we hold Detective Klementich had probable cause to believe Yepez had committed an act of family violence against Pantoja. *See Torres*, 182 S.W.3d at 901–02. Having determined the Yepez's arrest was not illegal, we further hold his subsequent statements to the Houston police were not fruit of the poisonous tree. *See Monge*, 315 S.W.3d at 40

### Jury Charge Error

Yepez contends the trial court erred in denying his request to include a concurrent cause instruction in the jury charge. Yepez argues he was entitled to this instruction because he presented evidence that the child died from dry drowning.

### Standard of Review

We review a claim of jury charge error in two steps. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). First, we determine whether there is error in the charge. *Id.* Second, if there is error, then we review the record to determine whether the error caused sufficient harm to require reversal. *Id.*

We review a trial court's decision to exclude a defensive instruction in the charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000) (en banc). We view the evidence in the light most favorable to the defendant's requested instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). A defendant is entitled to a jury instruction on a defensive issue if the issue "is raised by the evidence regardless of the strength or credibility of that evidence." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013).

### Applicable Law

Where the evidence shows another cause of the same result, the trial court is required to give a statutory instruction on concurrent cause. *Robbins v. State*, 717 S.W.2d 348, 351–52 (Tex.

- 13 -

Crim. App. 1986). This instruction provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *See* TEX. PENAL CODE ANN. § 6.04(a). To be entitled to a concurrent cause instruction, the evidence must show the concurrent cause was clearly sufficient by itself to produce the result, and the actor's conduct was clearly insufficient by itself to produce the result. *Id.* The concurrent cause must be "another cause" in addition to the actor's conduct, i.e., an "agency in addition to the actor." *Robbins*, 717 S.W.2d at 351 n.2. In contrast, an alternative cause "is simply a different version of facts, one which negates at least one element of the State's case." *Barnett v. State*, 709 S.W.3d 650, 652 (Tex. Crim. App. 1986).

*Application*

Throughout trial, Yepez denied striking Jasleen and argued Pantoja fabricated allegations that he held Jasleen over the sink and slammed Jasleen's head against it. According to Yepez, Jasleen died because of dry drowning. This contention that dry drowning caused the child's death presents an alternative cause and does not entitle Yepez to a concurrent cause instruction. *See Robbins*, 717 S.W.2d at 351 n.2. That is because Yepez's contention that Jasleen died as a result of dry drowning is not "another cause" of Jasleen's death in addition to Yepez's conduct, but rather is a different version of facts that explain her death. *See id.* (recognizing concurrent cause not presented where actor denies committing charged conduct); *Barnett*, 709 S.W.3d at 652. Accordingly, because no concurrent cause was presented, Yepez was not entitled to a concurrent cause instruction. *See Farmer*, 411 S.W.3d at 906. We therefore overrule Yepez's third issue.

### *Accomplice Witness Corroboration*

Finally, Yepez contends the evidence is insufficient to corroborate Pantoja's accomplice witness testimony. According to Yepez, there was no independent evidence that corroborated Pantoja's allegation that he struck Jasleen's skull on a hard surface.

### *Standard of Review and Applicable Law*

A conviction obtained based on accomplice testimony must be supported by sufficient corroborating evidence tending to connect the defendant to the offense committed. TEX. CODE CRIM. PROC. art. 38.14. When reviewing the sufficiency of the evidence to corroborate accomplice testimony, we eliminate the accomplice testimony and examine the remaining portions of the record to determine if there is any evidence that tends to connect the defendant with the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The corroborating evidence need not, standing alone, rise to the level of proof beyond a reasonable doubt. *Id.* The evidence must simply link the defendant to the commission of the offense and show that a rational juror could conclude the evidence sufficiently "tended to connect" the defendant to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). Accordingly, corroborative evidence need not be legally sufficient in itself to establish a defendant's guilt. *Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012).

In determining the question of corroboration, courts view the evidence in the light most favorable to the verdict. *Perez v. State*, 437 S.W.3d 610, 616 (Tex. App.—San Antonio 2014, no pet.). Evidence tending to connect the accused to the commission of the offense may be circumstantial. *See Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). Insignificant circumstances can satisfy this standard as there is no precise rule governing the amount of evidence required to corroborate accomplice witness testimony. *Perez*, 437 S.W.3d at 616 (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)).

*Application*

Even excluding Pantoja's accomplice testimony, the State introduced evidence connecting Yepez to the crime. The record reflects that Jasleen was last seen in Laredo at a motel with Yepez and Pantoja. The jury heard testimony from the motel clerk, who testified Pantoja, Yepez, and a child who fit Jasleen's description were staying at the motel. The jury also heard testimony from Pantoja's friend, who testified she spoke with Pantoja and Jasleen on the phone while they were staying at the Laredo motel with Yepez. The record further reflects that when Pantoja and Yepez returned from Laredo to Chicago, Yepez told several people, including Pantoja's father, that Jasleen had been kidnapped. Yet, as the investigation unfolded, Jasleen's remains were found in a shallow grave in an empty lot in Laredo near the motel where the three stayed. When asked by the police about Jasleen, Yepez stated Jasleen died from dry drowning and admitted to burying Jasleen at that location. The jury also heard testimony from Dr. Gill-King, who opined that Jasleen died because the top of her head was struck against a static object.

When viewing this evidence in the light most favorable to the verdict, we hold this evidence tends to connect Yepez with Jasleen's murder. *See Smith*, 332 S.W.3d at 442. The evidence clearly places Yepez at the Laredo motel when the offense was committed. It also establishes that Yepez told different stories about Jasleen's disappearance. Proof that an accused was at the scene when an offense was committed coupled with other suspicious circumstances is sufficient to tend to connect an accused to a crime. *See id*. Accordingly, the evidence of Yepez's presence coupled with his kidnapping and dry drowning stories and his admission that he buried Jasleen – tends to connect Yepez to the motel room where Pantoja testified Yepez killed her daughter. We therefore overrule Yepez's final issue.

**CONCLUSION**

We affirm the trial court's judgment.

Beth Watkins, Justice

Do Not Publish